UNITED STATES BANKRUPTCY COURT   For Publication
SOUTHERN DISTRICT OF NEW YORK
_____

|                                   |   |                          |
|-----------------------------------|---|--------------------------|
| In re:                            | : | Chapter 7                |
|                                   | : |                          |
| Donald David Kummerfeld,          | : | Case No. 09 B 16267 (AJG) |
|                                   | : |                          |
|     Debtor.   | : |                          |
|                                   | : |                          |
| Cordius Trust,                    | : |                          |
|                                   | : |                          |
|     Plaintiff,| : |                          |
|                                   | : | Adv. Pro. No. 10-2841 (AJG) |
|   v.                    | : |                          |
|                                   | : |                          |
| Donald David Kummerfeld,          | : |                          |
|                                   | : |                          |
|     Defendant.| : |                          |

OPINION CONCERNING MOTION FOR SUMMARY JUDGMENT


APPEARANCES:

ROBINSON & COLE LLP
Counsel for the Cordius Trust
Hartford, Connecticut

   By: Bradford S. Babbitt, Esq.


McCallion & Associates LLP
Counsel for Mr. Kummerfeld
New York, New York

   By: Kenneth F. McCallion, Esq.


ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

The issue presented concerns whether a debt based upon a judgment that results from a settlement that arises out of a securities fraud violation is nondischargeable against a debtor in bankruptcy when that debtor is derivatively liable for the debt as a control person of the corporation that is liable for the judgment.

As a preliminary matter, it is settled case law that, notwithstanding the settlement or entry of judgment, res judicata is not a bar to a bankruptcy court considering extrinsic evidence to determine if a person or corporation violated the securities laws. The bankruptcy court may, therefore, make an independent determination concerning whether the settlement or judgment entered arises from a security law violation.

The Court concludes that where a determination is made that a corporation was a primary violator of the securities laws, a person, who is deemed a control person pursuant to securities laws of such violating corporation, may be held jointly and personally liable for such debt. Such person, however, has the opportunity to establish an affirmative defense to that liability as provided under section 15 of the Securities Act and section 20a of the Exchange Act, for violations of the Securities Act and the Exchange Act, respectively. If that individual files for bankruptcy protection, unless such person can establish an affirmative defense to the control-person liability, such debt is nondischargeable, pursuant to 11 U.S.C. § 523(a)(19).

FACTS

On October 21, 2009, Donald D. Kummerfeld ("Kummerfeld") filed for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). Kummerfeld was a 50% shareholder, officer, and director of Kummerfeld Associates, Inc. ("KAI"), a corporation organized under the laws of New York State. His wife, Elizabeth Kummerfeld ("Ms.

2

Kummerfeld") was a 50% shareholder and the president of KAI.

Prior to filing for bankruptcy protection, Kummerfeld had been held liable for a debt owed by KAI to the Cordius Trust ("Cordius"), an irrevocable, *inter vivos* trust created under California law.  The judgment against Kummerfeld concerning that debt resulted from a jury trial conducted in the District Court for the Southern District of New York (the "District Court"), in which KAI's corporate veil was pierced and Kummerfeld was held personally liable on a judgment that Cordius had previously obtained against KAI and Ms. Kummerfeld in that court based upon the nonpayment of a promissory note.  After the piercing of the corporate veil, the judgment was entered against Kummerfeld, Ms. Kummerfeld, and KAI.

The original judgment against KAI and Ms. Kummerfeld resulted from the following facts.[1]  In 1997, Cordius and KAI executed an agreement, pursuant to which KAI would invest Cordius's funds in a "capital enhancement program."  Ms. Kummerfeld represented that Cordius would receive the return of its investment plus any profits.  The communications concerning the investment were primarily between the trustee of Cordius and Ms. Kummerfeld on behalf of KAI.  KAI never registered the investment program with the Securities and Exchange Commission.

Cordius threatened KAI and its president with suit for securities fraud and common law fraud.  The parties commenced negotiating a settlement and when efforts to finalize the settlement stalled, Cordius sent to Ms. Kummerfeld a draft civil complaint, which reflected

---

[1]Unless otherwise indicated, the facts are derived from the undisputed facts as established by the parties' Local Bankruptcy Rule 7056-1 Statements.

allegations of fraud and other misconduct.[2]  The draft complaint set forth various allegations of

fraud, including securities fraud, as well as other misconduct.[3]  Subsequently, KAI and Ms.

Kummerfeld finalized a settlement with the Trust by executing a promissory note (the "Note") in

Cordius's favor in the principal amount of $1,418,000.00.  Ms. Kummerfeld executed the Note

on March 5, 1999 "in both her individual capacity and her capacity as president of KAI."  *See*

February 2000 Opinion, at 83:3-83:5.[4]  KAI and Ms. Kummerfeld failed to repay the Note

according to its terms and Cordius sued to enforce the Note.  After trial, and in accordance with

its February 2000 Opinion,[5] on April 11, 2000, the District Court rendered judgment (the "April

2000 Judgment") in favor of the Trust and against KAI and Ms. Kummerfeld, jointly and

severally.  The Second Circuit affirmed that judgment on appeal.  *Cordius Trust v. Kummerfeld*

*Assocs., Inc.*, 242 F.3d 364 (2d Cir. 2000) (summary order).

Ms. Kummerfeld and KAI failed to make any payment on the original April 2000

Judgment.  In an effort to locate assets to pay for the outstanding judgment against Ms.

Kummerfeld and KAI, Cordius commenced a special turnover proceeding to pierce KAI's

corporate veil in order to reach the assets of Kummerfeld.

---

[2]This finding was made by the district court in its February 7, 2000 bench ruling.  *See* Transcript of Record at 82:25-83:2, *Cordius v. Kummerfeld*, No. 99-3200 (DLC) (No. 52) (S.D.N.Y. Feb. 7, 2000) (the "February 2000 Opinion").

[3]A copy of the draft complaint that had been provided to Ms. Kummerfeld was attached as an exhibit to the motion for summary judgment.

[4]Several years later, in issuing an August 29, 2007 opinion on a related matter in the case, the District Court referred to the Note as having been issued "to settle Cordius's claims against KAI for fraud and misconduct."  *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200, 2007 WL 2435156 at *3 (S.D.N.Y. Aug. 29, 2007) (the "August 2007 Opinion").

[5]In that opinion, the District Court also dismissed a counterclaim by Ms. Kummerfeld and KAI alleging that the Note was unconscionable.  February 2000 Opinion, at 88:1-88:12.

4

The District Court first granted Cordius's request to pierce KAI's corporate veil in an opinion issued on March 30, 2004. *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200, 2004 WL 616125 (S.D.N.Y. Mar. 30, 2004) (the "March 2004 Opinon").[6]  A judgment to that effect was entered on April 30, 2004 (the April 2004 Judgment").  On October 4, 2005, the Second Circuit reversed that portion of the March 2004 Opinion granting the request to pierce KAI's corporate veil and vacated the April 2004 Judgment. *Cordius Trust v. Kummerfeld*, 153 Fed. Appx. 761, 763 (2d Cir. 2005) (unpublished summary order).

Notwithstanding its decision to vacate the April 2004 Judgment, in the summary order, the Second Circuit affirmed the conclusion that, as a matter of law, Kummerfeld dominated KAI. *Id*.  In addition, the Second Circuit affirmed both that KAI defaulted on the Note and failed to pay the April 2000 Judgment that Cordius had obtained against it. *Id*.  Nevertheless, the Second Circuit remanded the matter for "further development of the factual record" concerning the veil-piercing issue. *Id*. at 764.  Specifically, the Second Circuit concluded that it had not yet been shown whether Kummerfeld used this domination to cause KAI to default on the Note or fail to pay the April 2000 Judgment. *Id*. at 763.  Further, the Second Circuit stated that it had not been shown that "these wrongs reflect the sort of abuse of the corporate form warranting the intervention of equity to pierce a corporate veil." *Id*.

After the matter was remanded, both parties moved before the District Court for summary judgment on the veil-piercing issue, which motions the District Court denied.  August 2007 Opinion, 2007 WL 2435156, at *6-7 (S.D.N.Y. Aug. 29, 2007).  Thereafter a jury trial was

---

[6]The proceeding had earlier been referred to a magistrate judge for post-trial supervision.  The magistrate judge recommended that a motion that had been made by Kummerfeld to dismiss the turnover proceeding be denied and that Cordius's motion to pierce the corporate veil be granted.  Thereafter, the District Court adopted the magistrate judge's recommendations.

conducted, after which, the jury rendered a verdict to pierce the corporate veil of KAI to allow

Cordius to reach Kummerfeld's assets, resulting in the District Court entering judgment against

Kummerfeld, Ms. Kummerfeld, and KAI.  *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200, 2008

WL 216405 (S.D.N.Y. Jan. 25, 2008) (the "2008 Judgment").[7]  The 2008 Judgment was affirmed

by the Second Circuit.  *Cordius Trust v. Kummerfeld*, 331 Fed. Appx. 810, 811 (2d Cir. 2009).

Kummerfeld filed for bankruptcy protection seeking to have his debts, including the debt

owed on the 2008 Judgment against him, discharged.  On February 18, 2010, Cordius

commenced this adversary proceeding seeking a determination that, pursuant to Bankruptcy

Code sections 523(a)(2)(a) and 523(a)(19), Kummerfeld's debt on the 2008 Judgment is

excepted from discharge because it arises out of a fraudulent securities transaction.  On July 30,

2010, the Cordius Trust filed a motion for summary judgment concerning the relief sought.  On

August 31, 2010, in addition to filing its response to Cordius's summary judgment motion,

Kummerfeld filed a motion titled Debtor's Cross Motion for Summary Judgment.[8]  A hearing

(the "Hearing") on this matter was held before the Court on September 22, 2010.

### *The Parties' Arguments*

While acknowledging that an "honest" debtor is entitled to a statutory discharge of its

debts to afford it an opportunity for a fresh start, Cordius argues that certain debts related to

---

[7]The wrongful act for which the corporate veil was pierced was Kummerfeld's action in precluding KAI
from paying the April 2000 Judgment.

[8]In other references to his motion, Kummerfeld describes it as a motion to dismiss.  However, because he
relies on matters outside of the complaint, it would, in any event, have to be converted to a motion for summary
judgment.  According to a scheduling order issued in this case, Kummerfeld's motion is untimely as any such
motions were to be filed by July 30, 2010.  Kummerfeld did not seek additional time to file the motion and it is
denied as untimely.  In any case, Kummerfeld's motion for summary judgment is denied for the additional reasons
set forth in this Opinion.

fraudulent conduct are excepted from discharge. Specifically, Cordius references sub-sections

(a)(2)(A) and (a)(19) of section 523 of the Bankruptcy Code, which except from discharge debts

that arise from fraudulent conduct. Cordius maintains that all of the elements necessary to

establish that Kummerfeld's 2008 Judgment debt to Cordius is excepted from discharge were

decided in the rulings issued by the District Court. Therefore, Cordius argues that summary

judgment should be entered in its favor.

In response, Kummerfeld argues that, for a debt based upon a securities violation or fraud

to be excepted from discharge, it must be shown that the debtor was a principal actor in the

alleged securities violation or fraud. At a minimum, Kummerfeld maintains that it must be

shown that he aided and abetted the alleged fraud or that there is some other type of privity to the

underlying acts. Kummerfeld argues that the debt he owes for the 2008 Judgment is

dischargeable because no court ever found that he had participated in a fraudulent securities

transaction or any fraud. Kummerfeld contends that the 2008 Judgment obtained against him

was based upon a finding that he had sufficient control over the affairs of KAI such that its

corporate veil should be pierced and he should be personally liable for the prior April 2000

Judgment obtained by Cordius against KAI and Ms. Kummerfeld. Thus, he argues that he was

found personally liable due to his position as an officer and shareholder of KAI. Further,

Kummerfeld maintains that the transaction at issue in the decision to pierce KAI's corporate veil

was KAI's failure to pay the judgment after it was rendered in 2000, not any alleged fraud or

securities violation that may have occurred in 1997.

Kummerfeld contends that, with respect to the exception to discharge contained in

section 523(a)(19), it has not been established that the underlying financial transaction was

7

subject to the securities laws.  Even if that were established, Kummerfeld further argues, that the

2008 Judgment is dischargeable because it does not arise from an alleged securities violation by

the debtor or other fraudulent conduct on his part.  Rather, he maintains that the alleged

securities violations or fraud were purportedly carried out by third parties, i.e., Ms. Kummerfeld

and KAI.

## DISCUSSION

Section 523(a)(2)(A) of the Bankruptcy Code provides, in relevant part, that an

individual debtor is not discharged "from any debt . . . for money . . . to the extent obtained by . .

. false pretenses, a false representation, or actual fraud . . . ."  Section 523(a)(19) provides, in

relevant part, that an individual debtor is not discharged from any debt . . . that . . .

> (A) is for . . . (i) the violation of any of the Federal securities laws . . . , any of the
> State securities laws, or any regulation or order issued under such Federal or State
> securities laws; or (ii) common law fraud, deceit, or manipulation in connection
> with the purchase or sale of any security; and
> (B) results, before, on or after the date on which the petition was filed, from –
>
> > (i) any judgment, order, consent order, or decree entered in any
> > Federal or State judicial or administrative proceeding;
> > (ii) any settlement agreement entered into by the debtor; or
> > (iii) any court administrative order for any damages, fine, penalty,
> > citation, restitutionary payment, disgorgement payment, attorney
> > fee, cost or other payment owed by the debtor.

Pursuant to these sections, debts that arise from fraudulent conduct or violations of the securities

laws are excepted from discharge.  In a proceeding pursuant to section 523(a) of the Bankruptcy

Code seeking to except a debt from discharge, "collateral estoppel principles . . . apply."

*Grogan v. Garner*, 498 U.S. 279, 284 n.11, 111 S. Ct. 654, 658 n.11, 112 L. Ed. 2d 755 (1991).

Further, in such a proceeding, "the ordinary preponderance-of-the-evidence standard" is the

proper standard of proof required to establish an exception to discharge.  *Grogan*, 498 U.S. at

8

291, 111 S. Ct. at 661.

The purpose of section 523(a) is to protect investors from the bankruptcy "loophole" that formerly allowed parties who violated securities laws or committed securities fraud to discharge obligations under court judgments or settlements based on that wrongdoing. *Hodges v. Buzzeo (In re Buzzeo)*, 365 B.R. 578, 582 (Bankr. S.D.N.Y. 2007) (citing S. Rep. No. 107-146 (2002) (other citations omitted)). *See also Archer v. Warner*, 538 U.S. 318, 321, 123 S. Ct. 1462, 1467, 155 L. Ed. 2d 454 (2003) (noting that the current "any debt" language of section 523(a) of the Bankruptcy Code comports with the intent to have "the fullest possible inquiry [conducted] to ensure that all debts arising out of fraud are excepted from discharge." (internal quotations omitted)).

In *Brown v. Felsen*, 442 U.S. 127, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979), the Supreme Court was presented with a case where the parties had entered into a stipulation to settle a lawsuit alleging money had been obtained through fraud. As a result, the state court entered a consent decree in accordance with the stipulation providing for the defendant to pay a sum certain to the plaintiff. *Id*. at 128, 99 S. Ct. at 2208. Neither the stipulation nor the consent decree entered by the state court indicated the cause of action upon which the liability was based and, therefore, there was no finding of fraud. *Id*. Thereafter, the defendant filed for bankruptcy protection and sought to have its debt discharged. *Id*. The debtor argued that because the stipulation and consent judgment did not make any reference to fraud, the principle of res judicata precluded the bankruptcy court from considering extrinsic evidence to determine the nature of the debt to ascertain whether it was dischargeable. *Id*. at 129, 99 S. Ct. at 2208. The Supreme Court disagreed and concluded that when considering the dischargeability of a debt, a

9

bankruptcy court was not confined to a review of the judgment and record in the prior state-court proceeding. *Id.* at 138-39, 99 S. Ct. at 2213. Rather, the Supreme Court held that extrinsic evidence could be considered by the bankruptcy court to determine whether a fraud had been committed because the dischargeability action was the first time the allegation was squarely at issue. *Id.* at 138, 99 S. Ct. at 2212.[9] The Supreme Court noted that "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt." *Id.*, 99 S. Ct. at 2213.

The holding of *Brown,* that extrinsic evidence may be considered in order to determine the dischargeability of a debt previously reduced to judgment after a settlement of a state court action, was extended to instances where parties settle a state court action based upon fraud even where there is no resulting judgment entered by the state court. *Archer*, 538 U.S. at 319-22, 123 S. Ct. 1462 (2003). In *Archer*, a state court lawsuit alleged that money was obtained by fraud in the sale of a company. *Id.* at 317, 123 S. Ct. at 1465. The parties settled the lawsuit for a sum certain, with a portion paid immediately and a promissory note executed for the balance. *Id.* As part of the settlement, releases were given to the defendants, which specified that the defendants did not admit to any liability or wrongdoing, and that the settlement was not to be construed as an admission of any liability. *Id.* As a result of the settlement, the plaintiffs dismissed the lawsuit with prejudice. *Id.* Thereafter, the defendants failed to pay the promissory note and the plaintiffs filed an action in state court to enforce the note. *Id.* at 317-18, 123 S. Ct. at 1465.

---

[9]In concluding that the principles of res judicata were not a bar to considering extrinsic evidence, the Supreme Court noted that the facts of the case were quite different from those where res judicata would apply. Instead of attacking the validity of the prior judgment, the creditor was seeking to enforce it. *Id.* at 133 (2210). The Supreme Court indicated that it was the debtor who actually disturbed the repose of the final judgment by filing for bankruptcy and asserting the defense of dischargeability, with the creditor merely responding to the debtor's move. *Id.* at 133-34 (2210-11).

Prior to any ruling by the state court, the defendants filed for bankruptcy protection and the creditors sought to have the debt on the promissory note deemed nondischargeable as a debt for money obtained by fraud. *Id*. at 318, 123 S. Ct. at 1465.[10]

The majority opinion acknowledged the dissent's argument that the broad language of the release, combined with the settlement agreement and promissory note, addressed and released all of the underlying state law claims, leaving only "a debt for money promised in the settlement agreement itself." *Id*. at 318-19, 123 S. Ct. at 1466. (citing *id*. at 323-34, 123 S. Ct. at 1468-69 (Thomas, J., dissenting). Nevertheless, the majority opinion concluded that it was still necessary to inquire as to whether "that same debt can *also* amount to a debt for *money obtained by fraud*, within the terms of the nondischargeability statute." *Id*. at 319, 123 S. Ct. at 1466 (emphasis in original). The Supreme Court saw no difference between looking behind a stipulation that results in a consent judgment to determine whether it reflected settlement of a valid claim for fraud, and looking behind a settlement. *Id*. at 320-21, 123 S. Ct. at 1467 (noting that the dischargeablility provisions apply to all debts arising out of fraud and that "[a] debt embodied in the settlement of a fraud case 'arises' no less 'out of' the underlying fraud than a debt embodied in a stipulation and consent decree.").[11] The Supreme Court indicated that if the nature of the

---

[10]One of the debtors in *Archer* agreed to entry of a consent order deeming the debt nondischargeable, the other contested that the debt was excepted from discharge. *Id*. at 318, 123 S. Ct. at 1465.

[11]The dissent disagreed arguing that there was a major difference between the facts of *Brown* and of *Archer*. *Id*. at 323-24, 123 S. Ct. at 1468-69. (Thomas, J., dissenting). In *Brown,* neither the stipulation nor consent judgment indicated the cause of action upon which the liability was based and, therefore, the dissent argues that there was no conclusive resolution of the fraud issue. *Id*. at 324, 123 S. Ct. at 1469. By contrast, according to the dissent, in *Archer*, the stipulation released the old fraud debt, replacing it with the new contract debt showing that the parties intended to conclusively resolve the fraud issue. *Id*. at 325, 123 S. Ct. at 1469. The dissent contended that, as a result, the causal relationship between the fraud and the debt had been cut and that absent proximate cause, it could not be established that the debt was "obtained by fraud" as required to establish nondischargeability. *Id*. at 325-27, 123 S. Ct. at 1469-70.

debt in the case of a settlement would change and render the debt dischargeable, the same outcome would apply in the case of a stipulation. *Id*. at 320, 123 S. Ct. at 1467.

Citing *Brown* and the current "any debt" language of section 523(a), the Supreme Court concluded that "the fullest possible inquiry" was intended "to ensure that 'all debts arising out of' fraud are excepted from discharge,' no matter what their form." *Id*. at 321, 123 S. Ct. at 1467 (citing *Brown*, 442 U.S. at 138, 99 S. Ct. 2205; *see also* 11 U.S.C. § 523(a)). Thus, the fact that the parties' settlement reduced the debt to one for money damages on a contract did not bar the creditors from the opportunity to show that the settlement debt arose out of false pretenses, a false representation or actual fraud, thereby rendering the debt nondischargeable. *Id*. at 323, 123 S. Ct. at 1468.

Thus, in both *Brown* and *Archer* the initial lawsuit alleged that money was obtained by fraud. In the former case, the parties stipulated to a settlement of the lawsuit for a sum certain, after which a consent order was entered. In *Archer* the parties entered into a settlement requiring the payment of a sum certain without the entry of a court order. In both cases, when the party who owed the sum certain failed to pay and subsequently filed for bankruptcy protection, it was concluded that, despite the previous resolution of the underlying lawsuit, the principles of res judicata would not bar the creditor from attempting to establish that the debt was of a type that would except it from discharge.

In *Buzzeo*, this same analysis was applied to a situation where the underlying lawsuit alleged violations of securities laws and common law fraud in the sale of a security. In a subsequent bankruptcy filing by the defendants, the lawsuit-plaintiffs argued that the judgment debt at issue was excepted from discharge pursuant to section 523(a)(19) of the Bankruptcy

12

Code. *Buzzeo*, 365 B.R. at 581.

The complaint in the underlying *Buzzeo* lawsuit had been filed only against Mr. Buzzeo.

*Id*. at 580. A settlement of the lawsuit was reached, in which both Mr. Buzzeo and his wife

contractually agreed to be responsible for the required settlement payment. *Id*. The judgment,

however, was entered only against Mr. Buzzeo. *Id*. at 581. After several amendments to the

settlement and the Buzzeos' failure to make payment, the lawsuit-plaintiffs brought a breach of

contract action against both Mr. and Mrs. Buzzeo. *Id*. In the contract action, the court entered a

supplemental judgment for a sum certain against both spouses and for an even larger amount

against Mrs. Buzzeo alone. *Id*. In a subsequent bankruptcy filing by both spouses, they each

sought a discharge of their respective debt on the judgment. *Id*. The lawsuit-plaintiffs argued

that the spouses' obligations on the judgments were excepted from discharge because they were

"'for common law fraud in connection with the sale of a security and result[ed] from judgments

entered in federal court proceedings and settlement agreements entered into by the debtors.'" *Id*.

(quoting Count I of the lawsuit-plaintiff's objection to discharge).

The bankruptcy court concluded that the *Archer* analysis applied in that "a settlement or

stipulated judgment reducing a previous claim for fraud into a monetary obligation without a

specific finding of fraud can continue to be barred from discharge under [section 523 of the

Bankruptcy Code]" and that the court was required to "look behind a settlement agreement to

determine if the debt was originally the product of fraud." *Id*. at 583 (citing *Archer*, 538 U.S. at

320-21, 123 S. Ct. at 1462).

With respect to Mr. Buzzeo, in examining the underlying facts, the bankruptcy court

concluded that summary judgment could issue because the *undisputed* underlying facts

13

established that the obligation stemmed from common law fraud in connection with the sale of a

security, and that the debt resulted from the settlement of the claim and the resulting judgment

entered by the court presiding over the underlying lawsuit. *Id*. at 5834. Therefore, the

bankruptcy court found that section 523(a)(19) was applicable and it granted summary judgment

to the effect that the underlying judgment debt owed by Mr. Buzzeo was excepted from

discharge. *Id*.

The bankruptcy court, however, required an evidentiary hearing with respect to whether

Mrs. Buzzeo's debt was for the violation of securities laws or for common law fraud in

connection with the sale of securities. *Id*. at 585. The Court concluded that there was an

insufficient factual record to resolve the issue on summary judgment. *Id*. Informing the

bankruptcy court's view was the fact that, although Mrs. Buzzeo "agreed to liability for the

obligation" by entering into the settlement agreement, there was nothing in that agreement or any

amendments to that agreement that indicated that she committed any wrongdoing. *Id*. at 584.

Moreover, the bankruptcy court noted that she was not a party to the underlying litigation,[12] nor

was judgment entered against her. *Id*. at 580, 583-84.

In the instant matter, both sides cite to the *Buzzeo* decision to support their positions. As

with Mr. Buzzeo, Cordius argues that summary judgment may issue in its favor as a result of

underlying undisputed facts, including the findings of the District Court. Kummerfeld argues

that summary judgment is inappropriate and that the *Buzzeo* court's analysis with respect to Mrs.

Buzzeo is more in line with the facts in this case.

---

[12]There were, however, allegations that during negotiations concerning the underlying litigation, it was
suggested that she might be added as a defendant in the action. *Id*. at 584.

14

Cordius argues that because at issue is the settlement of a lawsuit alleging violations of securities laws and fraud in the sale of a security, in accordance with *Brown* and *Archer*, a bankruptcy court may look behind the settlement agreement to see if the debt was originally the product of fraud. Cordius further argues that because of principles of collateral estoppel, any issues actually resolved in the underlying lawsuit are established for the purposes of the discharge action. Cordius maintains that because Kummerfeld was established as a control person of KAI in the underlying action, that fact is established for the purposes of the bankruptcy proceeding. Cordius further argues that the district court already determined that Cordius articulated claims for securities fraud and common law fraud against KAI and that KAI settled those claims by issuing the Note. Cordius asserts that when KAI failed to pay on the Note, the District Court entered judgment against KAI on the Note and, subsequently, against Kummerfeld on the Note. Cordius maintains that because the undisputed facts establish that KAI violated the securities laws and that Kummerfeld controlled KAI, as required under the relevant securities laws, summary judgment is appropriate.

Kummerfeld argues that the analysis of *Buizzeo* and its progeny does not apply to the instant matter because those cases concern individuals who actively participated in the fraud or in the violation of the securities laws. Kummerfeld contends that in his case, there has never been any finding that he actively participated in any fraud or securities violations. He maintains that, to the contrary, he was only deemed liable because he was a corporate officer and the corporation's veil was pierced. Kummerfeld further argues that, in addition to there being no findings made directly against him in the underlying lawsuit concerning securities violations or fraud in the sale of any security, neither were any such allegations even made in that proceeding.

15

Rather than fraud being alleged against him, he maintains that the only allegation of wrongdoing against him in the veil-piercing proceeding was that, as a control person of KAI during the period when KAI failed to pay the April 2000 Judgment, his conduct prevented or interfered with KAI fulfilling its obligation to pay on that judgment.

Kummerfeld acknowledges that if KAI were deemed liable in the underlying lawsuit for securities law violations or fraud in the sale of a security, and if KAI were to attempt to reorganize under chapter 11 of the Bankruptcy Code, KAI could not have the 2008 Judgment discharged in a plan it might seek to confirm. In the same manner, he concedes that if securities violations or fraud were at issue, Ms. Kummerfeld could not obtain a discharge of such debt with any finding of her active participation in the conduct. However, Kummerfeld contends that the same result would not automatically apply to his liability for the 2008 Judgment based on the veil piercing, absent a finding that he actively engaged in the fraudulent conduct.

Kummerfeld further argues that, based upon certain exceptions to the coverage of the securities laws at issue, there were no securities violations or fraud in the underlying transaction that Cordius entered into with KAI and Ms. Kummerfeld. Therefore, at a minimum, Kummerfeld argues that the discharge action cannot be decided on a motion for summary judgment.

In addition, Kummerfeld argues that, similar to the *Buzzeo* court's findings with respect to Mrs. Buzzeo, the factual record before this Court does not support entry of summary judgment and requires an evidentiary hearing.

### *Summary Judgment Standard*

Federal Rule of Civil Procedure ("Rule") 56(a) incorporated into bankruptcy practice by

16

Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7056 provides that summary judgment shall be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party that asserts "that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of material in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

Rule 56(a) specifies that to preclude summary judgment, the fact in dispute must be material.  Substantive law determines the facts that are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  If a fact is material, it is then necessary to see if the dispute about that material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  If the fact may be reasonably resolved in favor of either party, then there is a genuine factual issue that may only be resolved by the trier of facts and summary judgment will be denied.  *See id*. at 250.  If, however, the evidence "is so one-sided that one party must prevail as a matter of law," then summary judgment will be granted.  *Id*. at 251-52.  On considering a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970).

After the non-moving party to the summary judgment motion has been afforded a sufficient time for discovery, summary judgment must be entered against the party who fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

17

2548, 2552, 91 L. Ed. 2d 265 (1986).  It is said that there is no genuine issue concerning any

material fact because "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323, 106 S. Ct. at

2552.  In this manner, the summary judgment standard is similar to the directed verdict standard

under Rule 50(a).  *Id.*

The summary judgment standard is interpreted in a way to support its primary goal of

"dispos[ing] of factually unsupported claims or defenses."  *Id.* at 323-24, 106 S. Ct. at 2553.  The

summary judgment movant meets its burden by "'showing' . . . that there is an absence of

evidence to support the nonmoving party's case."  *Id.* at 325, 106 S. Ct. at 2554.

Where no triable issue of material fact exists, applying the summary judgment procedure

is not a disfavored procedural shortcut, but an integral part of the Federal Rules.  *Id.* at 327, 106

S. Ct. at 2555.

*The Factual Record*

The draft complaint that had been sent to KAI and Ms. Kummerfeld, among other things,

alleged violations of section 12(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C.

§ 77l, section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act), 15 U.S.C.

§ 78j(b), and Rule 10(b) promulgated thereunder, 17 C.F.R. § 240.10b-5.  In addition, there were

allegations pursuant to state law of fraud, negligent misrepresentation, conversion, deceptive acts

and practices, and breach of fiduciary duties.  Cordius maintains that the factual record supports

a finding that there was a violation of the Securities Act and the Exchange Act, and that either

such violation, combined with the fact that Kummerfeld controlled the primary violator and that

his debt results from the settlement, is sufficient to except his debt from discharge.

18

*Control-Person Liability Under the Securities Laws*

Section 15 of the Securities Act, which concerns violations of sections 11 and 12 of the

Securities Act, provides that

> Every person who, by or through stock ownership, agency, or otherwise, or who,
> pursuant to or in connection with an agreement or understanding with one or more
> other persons by or through stock ownership, agency, or otherwise, controls any
> person liable under sections 77k or 77*l* of this title, shall also be liable jointly and
> severally with and to the same extent as such controlled person to any person to
> whom such controlled person is liable, unless the controlling person had no
> knowledge of or reasonable ground to believe in the existence of the facts by
> reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.  Similarly section 20(a) of the Exchange Act, which concerns violations of the

Exchange Act, imposes derivative liability on a person who, either directly or indirectly, controls

an entity liable for violating the securities laws "unless the controlling person acted in good faith

and did not . . . induce . . . the . . . violation."  15 U.S.C. § 78t(a).

Diverse formulations have developed to establish a prima facie case under sections 15

and 20(a).  *See In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at

*5 (S.D.N.Y. Feb. 20, 2002) (describing the various formulations).  As described in *Deutsche

Telekom*, pursuant to one view, to establish a prima facie case of control-person liability under

either section, there must be "(1) an underlying primary violation of the securities laws by the

controlled person; and (2) control over that controlled person."  *Id*. at *5-6.  Once the prima facie

case is established, then the putative control person has an opportunity to prove its defense.  In

the case of section 15 of the Securities Act, to prove the defense, the control person must show

that it "had no knowledge of or reasonable ground to believe in the existence of the facts by

reason of which the liability of the controlled person is alleged to exist," and in the case of

section 20(a) of the Exchange Act, the controlling person must establish that it "acted in good

19

faith and did not . . . induce . . . the . . . violation."

In addition to requiring allegations concerning the underlying primary violation and control over the controlled person, the second formulation concerning the establishment of a prima facie case also requires "the addition of culpable conduct by the controlling person" for both section 15 and section 20(a). *Id*. at *5. The third view for a prima facie case, and the one adopted by the *Deutsche Telekom* court, retains the first two elements, requiring an underlying primary violation and control over the controlled person for both a section 15 and a section 20(a) violation, and limits the third requirement - - of showing that the control person was a culpable participant - - to the context of section 20(a).[13] *Id*. The *Deutsche Telekom* court stated that because section 15 liability attaches to violations of sections 11 and 12 of the Securities Act, which are strict liability sections, knowledge of the misrepresentation is not required for liability. *Id*. at *6. Inasmuch as knowledge of the misrepresentation is not required, it follows that culpable participation cannot be required to establish a prima facie case of control. With respect to section 15 liability, the Court agrees with the reasoning of the *Deutche Telekom* court.

As previously noted, once control is established, section 15 and section 20(a) each contain an affirmative exception to liability. Further, sometimes the section 20(a) affirmative defense that the party "acted in good faith and did not . . . induce . . . the . . . violation" is incorporated into the requirement for a prima facie case, by making allegations of culpable participation a necessary element for such showing. In the instant matter, however, it is not necessary to address whether culpable participation is part of the prima facie case or part of an

---

[13]Courts have also developed various formulations concerning a proper allegation of culpable participation, including (1) particularized facts concerning the control person's conscious misbehavior; (2) facts that give rise to a strong inference that the control person knew that the primary violator was engaged in fraudulent conduct; and (3) either conscious misbehavior or recklessness. *Id*. at *7 (citations and internal quotations omitted).

affirmative defense with respect to a section 20(a) violation because in either instance, factual issues concerning good faith and culpable participation preclude the matter from being decided on this motion for summary judgment.

Cordius maintains that the section 20(a) violations are merely an alternative argument to its main claim of section 15 violations. Therefore, the Court will address the section 15 allegations. In the instant case, the allegation is that KAI is the controlled person that committed the primary violation of the securities laws and that Kummerfeld controlled KAI.

### *KAI's Primary Violation*

As noted, a primary violation of the securities laws must first be established. With respect to the section 15 derivative liability, it is alleged that KAI violated sections 12(a)(1) and (2) of the Securities Act.

### Securities Act Violations

Section 12(a)(1) concerns the sale of security in instances where the Securities Act requires that such security be registered. The section imposes liability on any person who offers to sell, or sells, such security when it is not registered. To establish a violation of section 12(a)(1) of the Securities Act, it must be shown that there was (i) a sale or offer to sell securities by the defendant; (ii) the absence of a registration statement; and (iii) the use of the mails or the facilities of interstate commerce in connection with the sale or offer. *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 481 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992). The section imposes strict liability and, therefore, the primary violator's knowledge of the misrepresentation is not required. *Deutsche Telekom*, 2002 WL 244597, at *6. Privity, however, is required, as a purchaser can only recover from its immediate seller. *Laser Arms*, 794 F. Supp.

21

at 481-82.

Section 12(a)(2) of the Securities Act concerns offerings of a security utilizing a prospectus. The section prohibits materially misleading statements or omissions in prospectuses or oral communications[14] used to offer or sell securities. 15 U.S.C. § 77*l* (a)(2). *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).[15] If there is such violation, the section imposes liability on certain participants in a registered securities offering. *See id.* § 77*l* (a)(2). The section has a ''statutory seller'' requirement. *See Pinter v. Dahl,* 486 U.S. 622, 643-47 & n.21, 108 S.Ct. 2063, 2076-79 & n.21, 100 L. Ed. 2d 658 (1988) (other citation omitted). A statutory seller is one who "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner." *Morgan*, 592 F.3d at 359 (citing *Pinter,* 486 U.S. at 642, 647, 108 S. Ct. at 2076, 2078-79 (internal quotations omitted)).

To establish a prima facie claim under section 12(a)(2) requires allegations that

(1) the defendant is a statutory seller; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstance under which they were made, not misleading.

---

[14]The oral communication at issue must relate to a prospectus. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 567-68, 115 S. Ct, 1061, 1066, 131 L. Ed. 2d 1 (1995).

[15]The relief is similar to that contained in section 11 of the Securities Act, which prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k(a); *see also*, *Morgan*, 592 F.3d at 358 (noting that "[s]ections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications. 15 U.S.C. §§ 77k(a), 77*l* (a)(2)").

*Morgan*, 592 F.3d at 359 (citing 15 U.S.C. § 77 *l* (internal quotation marks omitted)).

Section 12(a)(2) does not apply to the offering or sale of a security in the context of a private placement. *Gustafson*, 513 U.S. at 580, 115 S. Ct, at 1072. Thus, it is relevant to determine if the securities were sold through a public offering or a private transaction. *Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005).

Cordius maintains that it meets all of the elements to establish KAI's violation of section 12(a)(1) and (2) of the Securities Act. Cordius asserts that, as a result of KAI's representations, made through its president, Ms. Kummerfeld, Cordius entered into the Agreement and invested in the "capital enhancement program." As such, Cordius contends that KAI sold Cordius an investment contract, which is a security covered under the Securities Act. In addition, Cordius asserts that a registration statement was not filed and that the transaction was implemented through mail, telephone, and fax communications. In addition, Cordius asserts that it meets all of the elements to establish a violation of section 12(a)(2), including the materiality of the misrepresentations and omissions concerning the offer.

Kummerfeld argues that the requirements for registration or the necessity of a prospectus concerning public offerings of securities are not applicable in the context of this transaction, which he asserts was a private placement. As a result, he maintains that there can be no violation of section 12(a) of the Securities Act.[16] Kummerfeld maintains that the transaction at issue has all of the indicia of a private placement because there was one purchaser and there was no

---

[16]At the Hearing, in response to the assertion by Cordius that Kummerfeld had conceded that the capital enhancement program offering was a security, he argued that no such concession had been made. In support of that claim, the Court's attention was directed to certain pages of Kummerfeld's submissions. A review of those pages, however, does not reveal any arguments disputing that the offering was a security. Instead, those pages reference Kummerfeld's arguments concerning his allegation that the underlying transaction is exempt from the securities laws as a private placement.

general solicitation or advertising for the offering.  Kummerfeld further argues that Cordius was a "sophisticated, high net-worth, 'accredited' investor."  In response to the argument that KAI did not file a Form D registration to comply with Regulation D under the 1933 Act, Kummerfeld argues that the absence of such formality is not dispositive because that regulation provides a "non-exclusive" safe harbor for private placements.  Kummerfeld argues that the exemption afforded under Form D does not preclude a party from otherwise showing that the facts and circumstances warrant exemption from registration for a security that is part of a private placement.

### The Private Offering Exemption

The registration requirements of the Securities Act were designed to "protect investors by promoting full disclosure of information . . . necessary to [make] informed investment decisions."  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124, 73 S. Ct. 981, 984, 97 L. Ed. 1494 (1953).  In *Ralston Purina*, the Supreme Court concluded that for a transaction to be exempt from the Act's requirements, the transaction would have to be one in which there was "no practical need for [the Act's] application."  *Id*. at 125, 73 S. Ct. at 984.  Thus, an offering made to parties who have "access to the kind of information which registration would disclose" and, therefore, can "fend for themselves," is a private offering exempt from the registration requirements.  *Id*. at 127, 125, 73 S. Ct. at 984-85.  The Supreme Court, however, declined to impose numerical criteria on qualification for a public offering.  *Id*. at 125-6, 73 S. Ct. at 984-85. Instead, the Supreme Court determined that application of the exemption "turns on the knowledge of the offerees," which then focuses the inquiry on their need "for the protections afforded by registration."  *Id*. at 126, 127, 73 S. Ct. at 985.

24

The party that asserts the private placement exemption has the burden of proof on the issue. *Ralston Purina*, 346 U.S. at 126, 73 S. Ct. at 985.  To determine whether an offering is public or private, courts consider

> (1) the number of offerees; (2) the sophistication and experience of the offerees; (3) the nature and kind of information which has been provided; (4) the size of the offering and the precautions taken to prevent the offerees from reselling their securities.

*Feldman v. Concord Equity Partners, LLC*, Slip Copy, 2010 WL 1993831 at *3 (S.D.N.Y. May 19, 2010) (citing *Steed Fin. LDC v. Nomura Sec. Int'l*, No. 00-CV-8058, 2001 WL 1111508, at *5 (S.D.N.Y. Sept. 20, 2001).

With respect to the sophistication of Cordius, Kummerfeld argues that Cordius is a high net-worth investor and, specifically, applies the term "accredited" investor to Cordius.  While labeling Cordius as a sophisticated investor, Kummerfeld does not present any factual allegations to support that assertion.  Moreover, as applied to a trust, an "accredited" investor is defined as "[a]ny trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person."  17 C.F.R. § 230.501(a)(7).  A sophisticated person is defined as one who "has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment." 17 C.F.R. § 230.506(b)(2)(ii).  Kummerfeld does not even attempt to substantiate that Cordius has that amount of assets or that the director of the trust has such experience.  Nor did Kummerfeld request an extension for discovery to seek to uncover any such information concerning Cordius.

Kummerfeld does assert that Cordius was the only purchaser of the offering but does not indicate whether other parties were solicited for the offering.  In addition, in light of the Supreme

25

Court's disinclination to set a threshold on the number of offerees that qualify an offering as either public or private, it is likely that courts consider the number of offerees only to the extent that such factor informs their decision concerning whether those offerees would have access to the type of information that a prospectus would contain.

More importantly, Kummerfeld does not suggest that Cordius had access to the kind of information which registration would have disclosed.  In fact, there are no allegations concerning the nature and kind of information that was provided.  If the inquiry is focused on the need for access to the information that a proper prospectus would have provided, as the Supreme Court directed in *Ralston Purina*, then Cordius needed that disclosure and information.

Kummerfeld has not provided any indication that he could satisfy the elements to establish that the exemption for a private placement applies, nor did Kummerfeld seek an extension of discovery to uncover any such evidence.  Therefore, because Kummerfeld has the burden of proof on the issue, and because of the absence of relevant allegations, the Court concludes on summary judgment that the private placement exemption does not apply and that the capital enhancement program was a public offering.

Cordius has shown all of the elements to establish KAI's violation of the Securities Act, and Kummerfeld has not met his burden to prove an exemption from its registration and disclosure requirements.  Therefore, KAI's primary violation of the Securities Act is not genuinely in dispute and is established for the purposes of this case.

Exchange Act Violations

It is alleged that KAI violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated by the SEC thereunder.  The allegations required to assert a claim for relief under

section 10(b) and rule 10b-5 are that "(1) the defendant misrepresented a material fact or failed

to disclose material information; (2) in connection with the purchase or sale of securities; (3)

committed with scienter; (4) on which the plaintiff relied; and (5) which proximately caused the

plaintiff's injury." *Laser Arms*, 794 F. Supp. at 488. As previously noted, control-person

liability for Exchange Act violations is imposed by section 20(a) of the Exchange Act.

Therefore, factual issues preclude a determination concerning those violations on this summary

judgment motion.[17]  In addition, factual issues concerning the scienter requirement would

preclude a determination of the underlying Exchange Act violations on a motion for summary

judgment.

*Kummerfeld's Control and Domination of KAI*

To be considered a section 15 control person, the person must have "the power, directly

or indirectly, 'to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise.'" *In re Deutsche

Telekom AG Sec. Litig.*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (quoting 17 C.F.R.

§ 230.405)).

Kummerfeld's control and domination of KAI was established previously by the District

Court. After setting forth the factors to establish whether a company was dominated, the District

Court adopted the magistrate's conclusion that

> Kummerfeld dominated KAI to the point that the corporation served as an alter
> ego for him and his wife, finding specifically that KAI disregarded corporate

---

[17]Cordius contends that Kummerfeld had an opportunity to assert defenses to the Exchange Act violations in the context of the District Court proceedings. As argued by Kummerfeld, however, the focus of those proceedings were Kummerfeld's actions in precluding KAI from making payment on the April 2000 Judgment on the Note after its entry. Therefore, he did not have an incentive in those proceeding to defend the import of his actions or inaction concerning the securities offering during the period of the offering and the followup communications.

formalities, that KAI was inadequately capitalized, that the Kummerfelds appropriated KAI funds for their own use, and that the Kummerfelds mingled their personal funds with KAI funds.

March 2004 Opinion, 2004 WL 616125 at *7.  The District Court further found that the facts described by the magistrate further "indicat[ed] that KAI was not treated as an independent profit center and that . . . Kummerfeld paid KAI's debts."  *Id.* at *8.

Kummerfeld argues that the District Court's conclusion as to his domination over KAI only relates to the period after the issuance of the April 2000 Judgment against KAI and its failure to pay that obligation.[18]

It is true that for the purposes of the turnover proceeding, the District Court was primarily concerned with establishing that Kummerfeld controlled KAI during the period when it failed to pay the April 2000 Judgment.  However, during discovery conducted in that proceeding, Kummerfeld only provided financial record for the years 1997, 1998, and 2000 and failed to provide financial records for the years 1999, 2002, and 2003.  Therefore, the Court was forced to address Kummerfeld's domination and control of KAI from 1997 forward based upon the information provided and extrapolate from the pattern established, together with additional financial information gleaned from testimony and other evidence presented.  Based upon that evidence, the District Court concluded that Kummerfeld controlled and dominated KAI.  Indeed, the District Court refers to the magistrate judge's finding concerning "Kummerfeld's *continued* funding and management of KAI *before and after* [the 2000 Judgment]."  March 2004 Opinion, 2004 WL 616125 at *7 (emphasis added).  In affirming that portion of the March 2004 decision,

---

[18]In 2004, however, when arguing that the magistrate erred in his Report in denying Kummerfeld's motion to dismiss, Kummerfeld inconsistently argued that Cordius had not adequately alleged that Kummerfeld exercised dominion and control over KAI during the period when it failed to pay the judgment owed to Cordius.  March 2004 Opinion, 2004 WL 616125 at *5.

the Second Circuit concluded that Kummerfeld's domination of KAI had been established as a

matter of law.[19]  *Kummerfeld*, 153 Fed. Appx. at *2.

Further, even if the District Court's ultimate conclusion on the issue of domination, and

the Second Circuit's ruling affirming that conclusion, only related to the period of time when

KAI failed to pay the April 2000 Judgment, this Court would still conclude that Kummerfeld

dominated KAI during 1997 forward by giving collateral estoppel effect to the findings of fact

set forth by the magistrate judge and adopted by the District Court judge in 2004.  The District

Court found that Kummerfeld had "not raised a material issue of fact with respect to his

domination of KAI."  March 2004 Opinion, 2004 WL 616125 at *8.  Specifically, the District

Court concluded that

> [t]he record supports the conclusion that KAI disregarded corporate formalities
> and was inadequately capitalized, and that the Kummerfelds appropriated KAI
> funds for personal use and commingled their funds with those of KAI.  In
> addition, the facts . . . indicate that KAI was not treated as an independent profit
> center and that . . . Kummerfeld paid KAI's debts.

*Id.*

The financial information provided to the magistrate and District Court judges was for

the years 1997, 1998, and 2000, with little or no information provided for 1999, 2002, or 2003.

---

[19]At first blush, the Court's reliance on the District Court's ruling for purposes of finding that Kummerfeld
controlled KAI during the period of the alleged securities violations may appear inconsistent with the Court's
previous determination that the focus of the District Court's proceedings with respect to culpable participation was
not on the period prior to the entry of the April 2000 Judgment.  The circumstances surrounding the District Court's
determination that Kummerfeld was a control person, however, warrant the disparate treatment.  In that regard,
Kummerfeld's failure to supply the necessary discovery forced the District Court to examine KAI's records for time
periods earlier than entry of the judgment, which periods coincided with that of the alleged violations of the
securities laws.  Thus, it was Kummerfeld's failure with respect to discovery that shifted the focus of the District
Court's inquiry to the period of the securities violations.  As a result, Kummerfeld had the opportunity and incentive
to address the issue concerning his control of KAI for the years from 1997 onward.  In any event, the District Court,
as affirmed by the Second Circuit, concluded that Kummerfeld controlled KAI both before and after entry of the
April 2000 Judgment, and this Court is bound by that determination.

Inasmuch as Kummerfeld failed to comply with discovery requests for financial information for

the years 1999, 2001, and 2002, the vast majority of the evidence relied upon in reaching this

conclusion was for the years 1997, 1998, and 2000.  Working with the limited information

provided, the District Court adopted the magistrate judge's findings that KAI disregarded

corporate formalities and was inadequately capitalized, specifically noting that the greatest

shortfalls of expenses over revenue revealed were for the years 1997 and 1998.  That time frame

was during the period when KAI and Cordius entered into the agreement and when Ms.

Kummerfeld, as principal of KAI, continued to represent to Cordius that its investment would be

returned with a profit.  In addition, the District Court adopted the magistrate judge's findings that

the Kummerfelds appropriated KAI funds for personal use and commingled their funds with KAI

funds.

The District Court also found that KAI ceased being profitable in the mid-1990's, with

KAI depending upon financing by Kummerfeld to continue to function.  In that regard, the

District Court specifically concluded that, to continue to function, KAI depended on

Kummerfeld's financing "at the time and shortly following the actions that gave rise to the

plaintiff's claims in 1997."  August 2007 Opinion, 2007 WL 2435156 at *2.

Thus, most of the underlying facts used by the District Court to establish Kummerfeld's

control and domination of KAI relate to 1997, 1998, and 2000.  As previously noted, relying on

that earlier pattern and with certain additional evidence both for those years and the later years,

in addition to the negative inference to be drawn from Kummerfeld's failure to provide the

requested discovery for the later years, the magistrate judge and District Court judge concluded

that Kummerfeld "continued" to fund and manage KAI both before and after the issuance of the

30

April 2000 Judgment.  Moreover, the District Court indicated that Kummerfeld, who had the

opportunity, failed to raise a material issue of fact with respect to the magistrate judge's

conclusions concerning his domination.  March 2004 Opinion, 2004 WL 616125 at *8.  Thus, it

was Kummerfeld's failure with respect to discovery that made the District Court's determination

concerning his control and domination during 1997 and 1998 necessary to the Court's ruling

and, in addition, Kummerfeld had a full and fair opportunity to litigate the issue.  As such, the

District Court's determination on that issue can be given collateral estoppel effect.  Accepting

the magistrate judge's findings concerning the underlying facts, the Court concludes that those

facts establish Kummerfeld's control and domination of KAI during 1997 and 1998 - - the period

relevant to the fraud allegations asserted.

### Affirmative Defenses

The Court has concluded that the capital enhancement program was a public offering for

which KAI did not file a registration statement or issue a prospectus, and that Kummerfeld was a

control person during the relevant period.  Nevertheless, Kummerfeld must be afforded an

opportunity to assert any affirmative defenses that he may have to liability as a control person.[20]

With respect to section 15, Kummerfeld argues that he had no knowledge of or reasonable

ground to know of KAI and Ms. Kummerfeld's actions concerning KAI's marketing of the

capital enhancement program to Cordius.  Kummerfeld maintains that his employment contract

with another company prohibited him from day to day control of KAI.  Rather, he asserts that

Ms. Kummerfeld, as president of KAI, was authorized to act alone to take actions to bind KAI.

---

[20]As previously noted, with respect to section 20(a), there are factual issues concerning whether
Kummerfeld acted in good faith and whether he induced any of the alleged securities violations.  In addition, the
scienter requirement to establish KAI's primary violation of the Exchange Act must be addressed if Cordius seeks to
pursue the section 20(a) claim.

Cordius argues that Kummerfeld knew or should have known of the fraud. Cordius asserts that there is no admissible evidence presented to dispute its allegations that KAI was losing money from as early as 1990, that it had no clients or legitimate businesses. Further, Cordius asserts that Kummerfeld "loaned" several million dollars to KAI, and used KAI to write-off taxable income, labeling such amounts as business losses and expenses. In addition, Cordius asserts that Kummerfeld has admitted that he reviewed the company's books and that he discussed KAI's finances with Ms. Kummerfeld. Cordius maintains that all of these undisputed facts point to the fact that Kummerfeld knew or should have known about the fraud. Cordius also references the fact that KAI's corporate veil was pierced and that KAI was considered Kummerfeld's alter ego.

### Piercing the Corporate Veil

Under New York law, to pierce the corporate veil for equitable purposes, it must be shown (1) that the owner exercised complete control over the corporation with respect to the transaction at issue; and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil. August 2007 Opinion, 2007 WL 2435156 at *5 (citing *Morris v. N.Y. State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141 (1993). Thus, the control must be used to commit a fraud or wrong that results in injury. *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997). The liability stems from using the control over the corporation for a wrongful purpose. Thus, for the corporate veil to be pierced concerning a particular transaction, it must be shown that the control over that specific transaction was used to perpetrate a fraud or wrong. *Mars Elecs. of N.Y., Inc. v. U.S.A. Direct, Inc.*, 28 F. Supp.2d 91, 98-99 (E.D.N.Y. 1998) (noting that for corporate veil to be pierced as to each particular transaction when separate sales

32

transactions were at issue, a showing was required that the owner used his control of the corporation "to commit fraud with respect to each and every transaction at issue").

As previously noted, the focus of the corporate veil-piercing proceeding before the District Court was on Kummerfeld's actions in preventing KAI from paying the April 2000 Judgment.  The wrong for which the corporate veil was pierced was preventing KAI from paying that judgment, not for any fraud or wrong committed in 1997 or 1998, when the securities were sold and the letters assuring future payment were sent.  Further, although Kummerfeld's failure to comply with discovery requests in the District Court proceeding prompted a determination by that court concerning Kummerfeld's control over KAI during periods prior to and after the April 2000 Judgment, that proceeding did not offer Kummerfeld an opportunity to establish any of the affirmative defenses that section 15 of the Securities Act and section 20a of the Exchange Act offer to a control person in an action based upon a violation of the securities law by the controlled entity.

Most of the facts that Cordius asserts are undisputed, including that KAI was losing money since 1990; that Kummerfeld "loaned" several million dollars to KAI, and used KAI to write off taxable income, labeling such amounts as business losses and expenses; and that Kummerfeld reviewed the company's books and discussed KAI's finances with Ms. Kummerfeld.  Pursuant to Rule 56(g), these facts that are not genuinely disputed are treated as established in the case.  Nevertheless, it is unclear how these facts establish that Kummerfeld knew or should have known about the fraud or securities violations committed in 1997 or in the follow-up correspondence in 1998, or how those facts establish Kummerfeld's lack of good faith or that he induced those securities violations.  Therefore, a limited evidentiary hearing is

33

required to afford Kummerfeld an opportunity to establish any affirmative defense to control-person liability.[21]

## CONCLUSION

KAI's offer to Cordius to participate in the capital enhancement program was not a private placement that would shield KAI from the requirements of registration or providing Cordius with a prospectus.  Further, KAI's failure to register the offering and to provide the disclosure required by a prospectus was a violation of the Securities Act.  The 2008 Judgment against Kummerfeld stems from KAI's settlement of its primary violation of the Securities Act.  In addition, as determined by the District Court, the fact that Kummerfeld controlled KAI is not genuinely in dispute and is treated as established in this case.  As a control person, pursuant to section 15 of the Securities Act and section 20a of the Exchange Act, Kummerfeld would be liable for any of KAI's primary violations of those acts unless he can establish the affirmative defenses set forth in those sections.

Pursuant to Rule 56(h), incorporated into bankruptcy law by Bankruptcy Rule 7056, KAI's primary violation of the Securities Act and Kummerfeld's status as a control person of KAI are not genuinely in dispute and are treated as established in this case.  There are, however, issues of fact concerning whether Kummerfeld can avail himself of the affirmative defenses to control-person liability for securities violations by the primary violator.  Therefore, an evidentiary issue is required, limited to affording Kummerfeld an opportunity to address those

---

[21]Although the veil-piercing proceeding in the District Court did not address the control-person liability issue regarding the securities fraud, the preclusive effect of certain findings in that proceeding limits the scope of the evidentiary hearing here.

defenses.[22]

Counsel for Cordius is to settle an order consistent with this opinion, and in accordance

with the Local Bankruptcy Rules.


Dated: New York, New York
      January 13, 2011


**s/Arthur J. Gonzalez**
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[22]If Cordius elects to pursue the section 20(a) control-person liability claims with respect to the Exchange Act, it must also address the issue of scienter concerning the allegations of KAI's primary violation of the Exchange Act.